

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00365-CV

_____

IN THE INTEREST OF P.M. AND A.M., CHILDREN

On Appeal from the 324th District Court
Tarrant County, Texas
Trial Court No. 324-725480-22

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

The trial court terminated Appellant Father's parental rights to Adam and Brad based on grounds under Section 161.001(b)(1)(D), (E), and (O) and the children's best interests under Section 161.001(b)(2) of the Texas Family Code.[1]  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2).  In his first of five issues that Father raised on appeal, Father argues that the trial court abused its discretion by denying his motion to continue the trial date and to extend the dismissal deadline.  Then, in his second through fourth issues, Father contends that the evidence was legally and factually insufficient to support the trial court's findings that he knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, *see id.* § 161.001(b)(1)(D); engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, *see id.* § 161.001(b)(1)(E); and failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the children's return; *see id.* § 161.001(b)(1)(O).  Finally, in his fifth issue, Father argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the children's best interests.  *See id.* § 161.001(b)(2).

---

[1]We use aliases to identify the children, and we identify family members by their relationship to the children.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).  We use a pseudonym for another person whose name might indirectly identify the children.

As to his first issue, because Father's motion to continue the trial date was not supported by an affidavit, as required by Rule 251 of the Texas Rules of Civil Procedure, the trial court did not abuse its discretion by denying it. And once the trial court denied Father's motion for continuance, his motion to extend the dismissal deadline became moot—his case was going to final trial regardless of any deadline extension. We thus overrule Father's first issue.

Regarding Father's third and fifth issues, we hold that the evidence is both legally and factually sufficient to support grounds under Subsection (E) and the best interests finding. Father had neither stable housing nor income. And despite Father's assertions to the contrary, a reasonable factfinder could have concluded that Father had a substance abuse problem. We thus overrule Father's third issue—attacking the Subsection (E) finding—and his fifth issue challenging the best interests finding.

Because resolution of Father's second and fourth issues will have no impact on his appeal's disposition, we do not reach them. *See* Tex. R. App. P. 47.1, .4; *In re D.S.*, 602 S.W.3d 504, 511 (Tex. 2020).

We affirm the trial court's termination judgment.

## I. BACKGROUND

### A. Father, Adam, Brad, and the Car Incident

On October 29, 2022, Father was found by the police sitting in a parked vehicle at a gas station with his eyes closed. Also inside the car were three-year-old

Adam and two-year-old Brad, two of Father's four children.[2]  The police arrested

Father for driving while intoxicated with passengers younger than 15 years of age.  *See*

Tex. Penal Code Ann. § 49.045.  As for Adam and Brad, the police found a short-

term placement for them.

## B.  Placements

The person with whom the police had left Adam and Brad then gave the

children to Carla Brown.[3]  Brown was familiar with Adam and Brad because she and

her husband had previously sheltered them and Father.

After the Department of Family and Protective Services filed a termination

petition on November 1, 2022, it placed Adam and Brad with their paternal aunt and

her husband.  The Department approved their home study.

## C.  Father's Release from Jail and Drug Issues

After Father's release from jail in February 2023, he stayed with Brown and her

husband.  But Father's stay with the Browns ended in March when they found him

passed out in his car with two baggies containing a leafy substance.  When confronted

about the baggies, Father became angry, accused Brown of stealing the baggies, and

left.

---

[2]Father had relinquished his parental rights to his two other children.  Even before this incident, Adam and Brad's mother had relinquished her parental rights to them.  As Father summarized it, "She left me and my boys."

[3]"Carla Brown" is a pseudonym.

After leaving the Browns, Father lived out of his car. His living conditions improved somewhat in August 2023 when Union Gospel Mission was able to provide him shelter. Around that same time, Father tested positive for methamphetamine and cocaine.

Father's termination trial began on September 14, 2023. He moved to continue the trial date and to extend the dismissal deadline, but the trial court denied both motions. After hearing the evidence, the trial court found predicate grounds under Subsections (D), (E), and (O) of Section 161.001(b)(1), found that termination was in the children's best interests under Section 161.001(b)(2), and terminated Father's parental rights to Adam and Brad.

## II. DISCUSSION

### A. Continuance of Trial and Extension of Dismissal Deadline

In Father's first issue, he complains that the trial court abused its discretion by denying his motion to continue the trial date and to extend the dismissal deadline.[4] In his motion, filed three days before the trial date, Father sought to change both the September 14, 2023 trial date and the November 6, 2023 dismissal deadline. *See* Tex. Fam. Code Ann. § 263.401(a) (setting the dismissal date as "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator").

---

[4]Termination proceedings have an automatic dismissal deadline. *See* Tex. Fam. Code Ann. § 263.401(a).

To get the relief Father wanted, he had to satisfy two requirements: Rule 251 of the Texas Rules of Civil Procedure, which governs motions to reset the trial date, *see* Tex. R. Civ. P. 251; *In re J.S.S.*, 594 S.W.3d 493, 500–01 (Tex. App.—Waco 2019, pet. denied) (mem. op.), and Section 263.401(b), (b-2), and (b-3) of the Texas Family Code, the statute governing motions to extend the dismissal deadline, *see* Tex. Fam. Code Ann. § 263.401(b), (b-2), (b-3); *see also In re G.C.*, No. 11-16-00245-CV, 2017 WL 549008, at *1 n.3 (Tex. App.—Waco Feb. 10, 2017, pet. denied) (mem. op.) (noting that parent filed a motion to extend the dismissal date under Section 263.401 but not a motion to continue the trial under Rule 251).

### 1. Trial Continuances

We will disturb a trial court's ruling on a motion for continuance only if the trial court clearly abused its discretion. *See* Tex. R. Civ. P. 251; *In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, and without reference to any guiding rules and principles. *In re E.L.T.*, 93 S.W.3d at 375. We cannot substitute our judgment for the trial court's. *Id.* at 374.

Rule 251 provides that a motion for continuance shall not be granted except for sufficient cause supported by an affidavit, consent of the parties, or by operation of law. Tex. R. Civ. P. 251; *In re E.L.T.*, 93 S.W.3d at 374–75.

For purposes of continuing the trial date, Father's motion did not comply with Rule 251 because it was not supported by affidavit. *See* Tex. R. Civ. P. 251. When the

6

motion is not supported by affidavit, we presume that the trial court does not abuse its discretion by denying it. *In re E.L.T.*, 93 S.W.3d at 374–75. Here, because Father's motion was not supported by an affidavit, the trial court did not abuse its discretion by denying his motion to continue the trial. *See In re J.P.-L.*, 592 S.W.3d 559, 576 (Tex. App.—Fort Worth 2019, pet. denied); *In re R.F. III*, 423 S.W.3d 486, 493 (Tex. App.—San Antonio 2014, no pet.); *In re E.L.T.*, 93 S.W.3d at 374–75.

### 2. Dismissal Date Extensions

Turning to Father's motion to extend the dismissal deadline, when extending a dismissal date, the trial court must also set—or effectively reset—a trial date.[5] *See* Tex. Fam. Code Ann. § 263.401(b)(3). As noted above, the trial court declined to reset the trial date. Thus, when the trial court denied Father's motion for continuance, his motion to extend the dismissal date effectively became moot. *See Sanchez v. AmeriCredit Fin. Servs., Inc.*, 308 S.W.3d 521, 526 n.4 (Tex. App.—Dallas 2010, no pet.) (ruling on one motion mooted a second motion). Regardless of whether the dismissal deadline was extended, Father's final trial date remained the same.

---

[5]Absent an extension, trial must start before the dismissal date. *See* Tex. Fam. Code Ann. § 263.401(a). Thus, if an extension is granted by agreement of the parties, resetting the trial date may occur as a matter of course to accommodate the additional time that the parent has to work services. Father's motion, however, was not an agreed motion.

7

We use an abuse-of-discretion standard when reviewing a trial court's decision to grant or deny an extension of the dismissal date. *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc op. on reh'g). Because the trial court effectively mooted Father's motion to extend the dismissal date when it denied his motion for continuance, we hold that the trial court did not abuse its discretion when denying his motion to extend the dismissal date.

We overrule Father's first issue.

## B. Legal and Factual Sufficiency

In issues two through four, Father attacks the legal and factual sufficiency of the evidence supporting the three predicate findings, and in issue five, he attacks the legal and factual sufficiency of the evidence to support the best interests finding.

### 1. Legal Requirements

To terminate a parent–child relationship, the Department must prove by clear and convincing evidence that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and that termination is in the child's best interests under Texas Family Code Section 161.001(b)(2). Tex. Fam. Code Ann. §§ 161.001(b)(1), (2), 161.206(a), (a–1); *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

### 2. Standard of Review

When reviewing the sufficiency of evidence supporting termination findings, we must determine whether a reasonable factfinder could have formed a firm belief or

8

conviction that the challenged findings were true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Both legal and factual sufficiency turn on this question; the distinction between the two analyses "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In our legal sufficiency analysis, we view the evidence "in the light most favorable to the finding" and assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *In re Z.N.*, 602 S.W.3d at 545; *see In re A.C.*, 560 S.W.3d at 630–31.

"Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review."). In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345.

The two sufficiency determinations overlap in many respects; if the evidence is factually sufficient, it is necessarily legally sufficient. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.).

9

Because Father challenges both legal and factual sufficiency, we will conduct a consolidated review.

### 3. Grounds

#### a. Only One Ground Needed to Affirm

The trial court found grounds under Subsections (D), (E), and (O). But "'[t]o affirm a termination judgment on appeal, a court need uphold only one [predicate] termination ground,' plus the best interest finding." *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at \*2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.) (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)); *see In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022). Because only one ground is necessary, and because we hold that Father's attack on ground (E) fails, we need not address his attacks on the (D) and (O) grounds. *See In re A.N.*, 2022 WL 2071966, at \*2; *see also In re M.P.*, 639 S.W.3d at 702.

#### b. Grounds under Section 161.001(b)(1)(E)

A finding under Subsection (E) supports termination if the trial court concludes that the parent "engaged in conduct . . . [that] endanger[ed] the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). Subsection (E) requires a voluntary, deliberate, and conscious course of conduct rather than a single act or omission. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at \*9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). The evidence of a parent's endangering course of conduct is not limited to actions directed

toward the child; indeed, the trial court may consider actions before the child's birth and actions while the child is not in the parent's presence because all such actions may create an inference that similar conduct could recur and jeopardize a child's well-being. *Id.*; *see In re J.O.A.*, 283 S.W.3d at 345.

As a preliminary matter, we note that the trial court, as the factfinder, did not have to believe anything that Father said. The factfinder enjoys the right to resolve credibility issues and conflicts within the evidence; thus, the factfinder may choose to believe all, part, or none of a witness's testimony. *In re I.O.*, 645 S.W.3d 895, 903 (Tex. App.—Amarillo 2022, no pet.); *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). When faced with conflicting evidence, the factfinder's determinations on such matters are generally regarded as conclusive. *In re I.O.*, 645 S.W.3d at 903.

Based on the trial court's ruling, it appears that the trial court did not find Father's testimony credible.[6] If we disregard Father's testimony, the remaining evidence showed that Father was engaging in conduct that endangered Adam and

---

[6]In the psychologist's report, he stated that "the validity of [Father's] self-report appears highly questionable." The psychologist did not think that Father was intentionally attempting to provide incorrect or contradictory information but that Father's questionable self-reporting was "more likely a function of poor abilities as a historian, poor insight, and poor understanding of circumstances." When tested for his IQ, Father's composite score was 83. He had a provisional diagnosis of borderline intellectual functioning.

Brad's physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

### i. Income

Father had no source of income. After being released from jail, he worked briefly at a garden nursery before he was let go. Although Father maintained that he later worked for the Parks and Recreation Department of the City of Denton, Father's caseworker, Jalen Rosales, asserted that she was never able to verify that employment and that Father had not provided her with any pay stubs. According to Brown, the nursery job had been Father's first job in eight years.[7] Under Subsection (E), courts may consider a parent's ability to provide financially for his children as a factor. *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *18 (Tex. App.—Fort Worth Nov. 6, 2014, no pet.) (mem. op.). While poverty should not be a basis for terminating parental rights, a parent's inability to provide basic utilities in the family home may constitute evidence of endangerment of the children's well-being. *In re G.C.S.*, 657 S.W.3d 114, 130 (Tex. App.—El Paso 2022, pet. denied).

---

[7]Before Adam and Brad's mother left them, she had been the family's primary breadwinner.

### ii. Disability

Father maintained that he was disabled.[8] Although he claimed that he was blind and deaf, Rosales testified that Father had no disabilities that she was aware of.

In addition to blindness and a hearing impairment, Father further maintained that he had an array of other health issues: COPD,[9] gout, heart problems, asthma, and high cholesterol. Once again, though, Father's testimony was the only evidence supporting any of these assertions, and the factfinder was not bound to believe him.

### iii. Housing

Father did not have stable housing. He lived out of his car for a while and then moved into the Union Gospel Mission shelter just prior to trial. But Father acknowledged that living in the shelter was not a safe place because shelter residents smoked weed, methamphetamine, and crack in the bathrooms. Homelessness, standing alone, may not be enough to support termination. *In re R.W.*, 627 S.W.3d 501, 512 (Tex. App.—Texarkana 2021, no pet.). A pattern of instability is the touchstone. *See In re M.N.G.*, 147 S.W.3d 521, 536, 538–39 (Tex. App.—Fort Worth 2004, pet. denied). And a pattern of instability is shown by the evidence in this case—

---

[8]The psychological report indicated that Father had asserted that he was blind in one eye and deaf in one ear from beatings he had received as a child. Other than Father's assertions, nothing corroborated these statements.

[9]"COPD stands for chronic obstructive pulmonary disease." *Black v. State*, No. 02-21-00057-CR, 2022 WL 3464563, at *11 n.23 (Tex. App.—Fort Worth Aug. 18, 2022, no pet.) (mem. op., not designated for publication).

while this case was pending, Father lived in the county jail, with the Browns, in his car, and in a shelter. Although Father testified that Union Gospel Mission had put him on a list to be placed in a house, no one from Union Gospel Mission corroborated that it was actively trying to place Father in a house.

### iv. Substance Abuse

Father was twice found passed out behind the steering wheel of his car—once by the police and once by the Browns. While Father's passing out might be attributable to health issues, it could also be attributable to drug use. Rather than send Father to the hospital for medical treatment, when the police found Father passed out in his car with Adam and Brad, the police sent Father to jail because he appeared to be intoxicated. And when Brown found Father passed out in his car, she also saw two baggies full of a leafy substance. While Father testified that he had gone to see a brain specialist the day before trial to find out what was wrong, Rosales testified that she was not aware of any efforts that Father had made to be diagnosed or treated.

Just one month before trial, Father tested positive for methamphetamine and cocaine. Father admitted to selling drugs and using methamphetamine in the past, although at trial he denied using drugs and maintained that he had been clean for five years. Regarding the alcohol allegations, Father admitted being arrested for public intoxication in 2011 and 2014 and driving while intoxicated in 2012, but he claimed

that he had not consumed any alcohol in 12 years.  But again, the factfinder did not have to believe him.

### v.  Summary

In short, because Father could not support or shelter himself, the trial court could have reasonably concluded that he would not be able to support or shelter his children.  Father also appeared to have a drug or alcohol problem that he refused to acknowledge, and a rational factfinder could have reasonably concluded that not only did Father pass out from drug or alcohol use but also that he drove while under the influence of drugs or alcohol at least twice—once while the children were in the car with him.  Such conduct endangered his own physical and emotional well-being and, in turn, had endangered and would endanger that of Adam and Brad as well.

### vi.  Ruling on Subsection (E)

Whether viewing the evidence in the light most favorable to the judgment or weighing all the disputed evidence, a reasonable factfinder could have formed a firm belief or conviction that Father's course of conduct endangered the children's well-being.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re E.J.H.*, No. 07-22-00074-CV, 2022 WL 2346631, at *1 (Tex. App.—Amarillo June 29, 2022, pet. denied) (per curiam) (mem. op.) (holding evidence sufficient where parent had drug issues and had failed to prove that she had suitable housing or employment); *In re I.I.T.*, 648 S.W.3d 467, 475–76

15

(Tex. App.—San Antonio 2021, no pet.) (holding evidence legally and factually sufficient under (E) where parent had drug issues, was unemployed, and had questionable housing). We overrule Father's third issue.

### c. Subsections (D) and (O)

Having overruled Father's third issue attacking the trial court's finding of grounds under Section 161.001(b)(1)(E), we need not reach Father's second and fourth issues—attacking the trial court's findings of grounds under Section 161.001(b)(1)(D) and Section 161.001(b)(1)(O). *See* Tex. R. App. P. 47.1; *In re A.N.*, 2022 WL 2071966, at 2; *see also In re M.P.*, 639 S.W.3d at 702.

## 4. Best Interests

### a. Legal Principles

Although courts generally presume that keeping children with a parent is in the children's best interests, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best interest analysis is child-centered and focuses on the children's well-being, safety, and development, *In re A.C.*, 560 S.W.3d at 631. In determining whether evidence is sufficient to support a best interests finding, courts review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence that is probative of a Subsection (b)(1) ground may be probative in determining the children's best interests. *Id.* at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). Courts also consider a number of nonexclusive factors when determining the children's best interests:

16

- the children's desires;

- the children's emotional and physical needs now and in the future;

- the emotional and physical danger to the children now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the children's best interests;

- the plans for the children by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interests finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *In re C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice to support a finding that termination is in the children's best interests. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*; *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *15 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.).

### b. Discussion

#### i. The Children's Desires

At the time of trial, Adam was four years old, and Brad was three years old. Neither testified at trial, and both lacked sufficient maturity to express an opinion regarding a parental preference. *See In re J.E.*, No. 02-23-00141-CV, 2023 WL 5115202, at *7 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op.). This factor neither favors nor disfavors termination.

#### ii. The Children's Emotional and Physical Needs Now and in the Future

Children need long-term stability and safety. *In re C.B.*, No. 02-22-00212-CV, 2022 WL 15076123, at *3 (Tex. App.—Fort Worth Oct. 27, 2022, pet. denied) (mem. op.). Providing for children's physical and emotional needs is of paramount importance. *Id.*

Father could provide Adam and Brad neither a stable nor a safe home. This factor weighs in favor of termination.

#### iii. The Emotional and Physical Danger to the Children Now and in the Future and the Parental Abilities of the Individuals Seeking Custody

As explained below, a factfinder could have reasonably concluded that Father's parenting presented an emotional and physical danger to Adam and Brad.

18

- **Psychological Evaluation**

The psychological evaluation expressed concerns about Father's parenting: "Regarding his ability to parent effectively, [Father] endorses parenting attitudes with a moderate-to-high level of risk for future child maltreatment." Although Father was taking parenting classes, the psychological evaluation questioned his ability to benefit from them: "[Father's] overall cognitive abilities were estimated to fall in the Below Average range with Mildly Impaired mental status. . . . [T]here was sufficient evidence to suggest that [Father's] overall cognitive abilities may complicate his ability to fully engage in treatment and intervention services." The evaluation also questioned Father's ability to follow through on commitments.

- **Adult–Adolescent Parenting Inventory**

The psychological evaluation included an "Adult–Adolescent Parenting Inventory." Three scores were possible—high, moderate, and low. "Moderate risk scores on these constructs are indicative of the beliefs of the general population. Low-risk scores indicate a parenting attitude that is nurturing and non-abusive; whereas[] high-risk scores are indicative of parenting practices known as abusive/neglectful."[10] Father was scored at a medium risk on all but one category, "low level of empathy," on which he was scored at high risk:

---

[10]Implicit in these ratings is that the general population does not engage in nurturing and non-abusive parenting. If a parent is nurturing and non-abusive, the parent is not classified with the general population.

- Under the category "inappropriate expectations," Father was rated a medium risk. "Inappropriate expectations" was described as "having expectations that exceed the developmental ability of children."

- Under the category of "low level of empathy," Father was rated as a high risk. This category was designed to reflect "nurturing skills and ability to manage parenting stress."

- Under the category of "corporal punishment," Father was rated a medium risk. "Corporal punishment" reflected "the tendency to [rely] on physical punishment rather than understanding alternatives to discipline."

- Under the category of "role reversal," Father was rated a medium risk. "Role reversal" encompassed "the risk of using children to meet self-needs or treat children as confidants."

- Under the category "values power–independence," Father was rated a medium risk. This category sought to gauge "the expectation of undue cooperation from children or tendency to place value on children's ability to problem-solve." [Capitalization altered.]

Notably, Father was not a low risk in any category. And in the abstract, while Father's medium scores do not necessarily raise any red flags, in the context of someone who had a provisional diagnosis of borderline intellectual functioning and who appeared unable to take care of himself, a rational factfinder could have reasonably found these medium scores to be concerning.

- **Brown Expresses Concerns**

In describing Father's parenting as "minimal," Brown related that one evening Father decided to take Adam and Brad with him to the fair. While Father told the Browns that he would be back by nine o'clock, he did not return at all that night, and

20

Brown began to worry that his car might have broken down. Not until ten o'clock the next morning did Brown see Father, Adam, and Brad again. Brown explained that as she was leaving her home to run an errand, she saw Father parked at the end of the driveway and spoke to him, and when she later returned, Father was still in his car, and Adam and Brad were strapped in the backseat. Brown said that she reprimanded Father for leaving the children "cooped up all night."

According to Brown, Father gave three stories. The first was that he had left Adam and Brad at a friend's house to spend the night. The second was that the police had approached him in a Tom Thumb parking lot because he was slumped over the steering wheel. The third was that the police had approached him in a McDonald's parking lot, where he explained to the police that he was just feeding his children.

This incident was not Brown's only concern. She also testified that she saw cigarette burns on Adam's arm, and when she took photos of the burns, Father protested. Brown said that Father became upset when she pointed out the burns on Adam's arm and that he took offense that she would suggest that he burned one of his own children. Father claimed that the marks on Adam's arm were insect bites, but Brown said that the marks did not look like insect bites to her and that Brad did not have the same marks on him.

- **Rosales Expresses Concerns**

Rosales also expressed concerns about Father's parenting and his ability to discipline the children. Rosales testified that while Father had made some

improvements in interacting with the children during visits, he had not learned much from his services.

- **The Paternal Aunt**

The alternative to Father was the paternal aunt, and the children were doing well with her. The Department had approved the paternal aunt's home study.

- **Drug Use**

Father had drug-abuse issues. A parent's use of drugs may compromise the parent's ability to supervise and care for his children. *See In re K-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.).

- **Determination**

We conclude that these two factors—current and future emotional and physical danger to the children and Father's parental abilities—favor termination.

### iv. The Programs Available to Assist These Individuals to Promote the Children's Best Interests

Father worked services, but whether he benefited from them was disputed. As noted earlier, the psychological evaluation questioned both Father's ability to learn and his ability to follow through on his commitments. Because Father's ability to profit from services was questionable, and because his ability to follow through with any services was also questioned, we conclude that this factor slightly favors termination.

22

### v. The Plans for the Children by These Individuals or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement

After the home study for the paternal aunt had been approved, the aunt's husband passed away. For purposes of a permanent placement, the Department representative did not foresee a problem, but the representative acknowledged that the details had not yet been worked out.

Although the current placement still had issues, the Department's goal was a stable home. Regardless of any questions regarding the paternal aunt, termination remained a better option for Adam and Brad. Returning the children to Father meant exposing them to drugs, housing instability, and the chaos of future removals should the police find Father passed out at the wheel of his car again and arrest him. A "forever" family is the goal. *See In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *11 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.). Adoption by the paternal aunt—or anyone else—was not possible so long as Father's parental rights remained intact. *See id.* Any doubts about the placement with paternal aunt due to the death of her husband were minor compared to the concerns that returning the children to Father would raise.[11] These factors favor termination.

---

[11]Uncertainty about the children's future after termination might, depending on the circumstances, be weighed differently. *See, e.g.*, *In re Z.W.*, No. 02-18-00190-CV, 2018 WL 4354404, at *13 (Tex. App.—Fort Worth Sept. 13, 2018, no pet.) (mem. op.) (stating that where Father and Mother had secured suitable housing, instability in the foster placement and uncertainty about any future adoption weighed against termination); *In re J.D.*, No. 02-11-00328-CV, 2012 WL 3115804, at *17 (Tex. App.—

### vi. The Parent's Acts or Omissions Indicating that the Existing Parent–Child Relationship is Not a Proper One and any Excuse for the Parent's Acts or Omissions

Father appeared to abuse drugs. This case started when the police found Father passed out behind the wheel of his car and arrested him for driving while intoxicated with passengers younger than 15 years of age. This was not an isolated incident; the Browns also found Father passed out in his car with two baggies containing a leafy substance beside him. A month before trial, Father tested positive for methamphetamine and cocaine. Although Father maintained he no longer used drugs, a reasonable factfinder could have concluded that Father continued to abuse drugs notwithstanding his denials.

Father asserted that he could not work because he was disabled. Whether Father was disabled was not clear, but what was clear was that he was not receiving disability income. Father proffered explanations for why he was not receiving disability income and asserted he was in the process of receiving disability income, but the bottom line was that he was not receiving disability income.

Rosales observed that Father always had an excuse and always asserted that it was someone else's fault. According to Rosales, Father refused to take accountability for his actions. Brown also expressed concerns that Father consistently blamed

---

Fort Worth Aug. 2, 2012, no pet.) (mem. op.) (stating that although the current foster placement was not the placement being considered for adoption, other factors still favored termination).

24

others and avoided taking responsibility for his actions. These two factors weigh in favor of termination. *See In re J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [the father] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.").

### c. Ruling

Applying the applicable standards and scopes of review, we conclude that the evidence was legally and factually sufficient to enable the trial court to form a firm belief or conviction that terminating Father's parental rights to Adam and Brad was in Adam and Brad's best interests. *See In re Z.N.*, 602 S.W.3d at 545; *In re A.C.*, 560 S.W.3d at 631. We overrule Father's fifth issue.

## III. CONCLUSION

Having overruled three of Father's five issues and determined that addressing his remaining two issues would have no impact on his appeal and, therefore, need not be addressed, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: March 7, 2024

25